Case No. 12-17805
_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

ZACK WARD and THOMAS BUCHAR,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants*,

v.

APPLE INC.,
*Defendant-Appellee.*
_____

On Appeal from an Order of the United States District Court
for the Northern District of California
The Honorable Yvonne Gonzalez Rogers
(No. C 12-05404-YGR)
_____

**BRIEF OF DEFENDANT-APPELLEE**
*[PUBLIC VERSION - REDACTED]*
_____

Daniel M. Wall
Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-6538
(415) 391-0600

J. Scott Ballenger
Roman Martinez
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
(202) 637-2200

*Counsel for Defendant-Appellee Apple Inc.*

Dated:  June 21, 2013

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee Apple Inc. hereby states that it is a California corporation, it has no parent corporation, and no publicly-held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF STATUTORY ADDENDUM ....................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION................................................................5

STATEMENT OF FACTS ............................................................................5

    A.    Apple And ATTM's iPhone Collaboration ...............................6

    B.    Procedural Background .........................................................10

SUMMARY OF ARGUMENT ....................................................................19

ARGUMENT ...........................................................................................22

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DISMISSED THIS CASE BECAUSE ATTM IS A "REQUIRED" PARTY UNDER RULE 19(A) ...............................................22

    A.    ATTM Has Unambiguously Claimed An Interest In This Case ...........23

    B.    Adjudicating This Case Without ATTM Will Impair ATTM's Ability To Protect Its Contractual Interests............................................27

        1.    An Absent Party Is "Required" If The Litigation Threatens To Impair That Party's Contractual Rights..............28

        2.    Plaintiffs' Request For Injunctive Relief Threatens To Impair ATTM's Rights In Its Contracts With Apple................34

        3.    Plaintiffs' Antitrust Theory Threatens ATTM's Rights In Its WSA With Consumers.........................................38

**Page**

C. Adjudicating This Case Without ATTM Threatens Other Practical Harms To ATTM....................................................................42

D. ATTM's Joinder Is Feasible ..................................................48

E. Even If ATTM's Joinder Were Not Feasible, Dismissal Would Still Be Required Because ATTM Is Indispensable Under Rule 19(b)..........................................................................................49

II. DISMISSAL IS ALSO PROPER BECAUSE PLAINTIFFS CANNOT PLAUSIBLY ALLEGE THAT ATTM HAS MONOPOLY POWER WITHIN A RELEVANT MARKET.................................................52

CONCLUSION .........................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011)........................................................1, 13, 52

*Akhtar v. Mesa*,
    698 F.3d 1202 (9th Cir. 2012) .........................................................5

*American Greyhound Racing, Inc. v. Hull*,
    305 F.3d 1015 (9th Cir. 2002) ...............................................*passim*

*American Health Underwriters, Inc. v. Golden Rule Insurance Co.*,
    No. 5:10cv199, 2012 U.S. Dist. LEXIS 124338 (E.D. Tex. July 9,
    2012) ...............................................................................47

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008)...........................................55

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................5, 52

*Cachil Dehe Band of Wintun Indians v. California*,
    547 F.3d 962 (9th Cir. 2008) ......................................................28

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
    386 U.S. 129 (1967)...............................................................25

*Coneff v. AT&T Corp.*,
    673 F.3d 1155 (9th Cir. 2012) ....................................................52

*Dawavendewa v. Salt River Project Agricultural Improvement & Power
    District*,
    276 F.3d 1150 (9th Cir. 2002) ................................................28, 50

*Eastman Kodak Co. v. Image Technology Services*,
    504 U.S. 451 (1992).........................................................57, 58, 63

**Page(s)**

*EEOC v. Peabody Western Coal Co.*,
   400 F.3d 774 (9th Cir. 2005) .........................................................................48

*Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*,
   516 F.3d 18 (1st Cir. 2008).....................................................................43, 50

*Freeman v. San Diego Association of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) ......................................................................42

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) ................................................................43

*Hendricks v. Bank of America, N.A.*,
   408 F.3d 1127 (9th Cir. 2005) ......................................................................23

*In re Apple & AT&TM Antitrust Litigation*,
   596 F. Supp. 2d 1288 (2008) ............................................................12, 55, 62

*In re Apple & ATTM Antitrust Litigation*,
   No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270 (N.D. Cal. July 8,
   2010) .............................................................................................................13

*In re Apple & ATTM Antitrust Litigation*,
   826 F. Supp. 2d 1168 (N.D. Cal. 2011).....................................10, 11, 14, 48

*In re Apple iPhone Antitrust Litigation*,
   874 F. Supp. 2d 889 (N.D. Cal. 2012).........................................14, 16, 17, 44

*Kescoli v. Babbitt*,
   101 F.3d 1304 (9th Cir. 1996) ......................................................................29

*KnowledgePlex, Inc. v. Placebase, Inc.*,
   No. C 08-4267 JF (RS), 2008 U.S. Dist. LEXIS 103915 (N.D. Cal.
   Dec. 17, 2008)..........................................................................................43, 46

*Laker Airways, Inc. v. British Airways, PLC*,
   182 F.3d 843 (11th Cir. 1999) ...............................................................*passim*

**Page(s)**

*Lomayaktewa v. Hathaway*,
520 F.2d 1324 (9th Cir. 1975) ......................................................2, 28, 31, 50

*Manybeads v. United States*,
209 F.3d 1164 (9th Cir. 2000) ...................................................................29

*Matheson v. Gregoire*,
161 P.3d 486 (Wash. Ct. App. 2007) ........................................................32

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)....................................................................................59

*Newcal Industries, Inc. v. IKON Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ...........................................................*passim*

*Northrop Corp. v. McDonnell Douglas Corp.*,
705 F.2d 1030 (9th Cir. 1983) ...................................................................29

*Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*,
331 F. Supp. 92 (C.D. Cal. 1971) ...................................................31, 32, 33

*Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*,
461 F.2d 1261 (9th Cir. 1972) ...................................................................32

*Orsay v. Department of Justice*,
289 F.3d 1125 (9th Cir. 2002) ...................................................................53

*Paiute-Shoshane Indians of the Bishop Community v. City of Los Angeles*,
637 F.3d 993 (9th Cir. 2011) ................................................................50, 51

*Provident Tradesmens Bank & Trust Co. v. Patterson*,
390 U.S. 102 (1968)....................................................................................43

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .......................................................................56

*Rebel Oil Co. v. Atlantic Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ......................................................................55

**Page(s)**

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*,
    188 F.3d 11 (1st Cir. 1999)................................................................57

*Shimkus v. Gersten Cos.*,
    816 F.2d 1318 (9th Cir. 1987) ......................................................25

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ........................................................61

*Syufy Enterprises v. American Multicinema, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ........................................................42

*Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*,
    368 F.3d 1053 (9th Cir. 2004) ......................................................49

*United States ex rel. Morongo Band of Mission Indians v. Rose*,
    34 F.3d 901 (9th Cir. 1994) ..........................................................27

*United States v. Oregon*,
    839 F.2d 635 (9th Cir. 1988) ........................................................43

*United States v. Stringfellow*,
    783 F.2d 821 (9th Cir. 1986) ........................................................43

*Universal Avionics Systems Corp. v. Rockwell International Corp.*,
    184 F. Supp. 2d 947 (D. Ariz. 2001) ............................................58

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)......................................................................53

*Wilbur v. Locke*,
    423 F.3d 1101 (9th Cir. 2005) ...............................................*passim*

## STATUTES AND RULES

28 U.S.C. § 1391 .......................................................................48

Fed. R. Civ. P. 19 ...............................................................*passim*

**Page(s)**

## OTHER AUTHORITY

Philip E. Areeda & Herbert Hovenkamp: *Antitrust Law:*
*An Analysis of Antitrust Principles and Their Application*
(last updated Apr. 2013) ............................................................10, 53, 58, 59

Restatement (Third) of Law Governing Lawyers (2000) ........................................26

Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak,*
63 Antitrust L.J. 483 (1995) ...........................................................................56

## STATEMENT OF THE ISSUES

1. Whether the District Court abused its discretion when it dismissed the case under Rule 12(b)(7) because Plaintiffs failed to join AT&T Mobility, LLC as a necessary party under Rule 19.

2. Whether plaintiffs' conspiracy-to-monopolize claim under the Sherman Act should be dismissed under Rule 12(b)(6) because Plaintiffs have not pleaded monopoly power.

## STATEMENT OF STATUTORY ADDENDUM

The text of Federal Rule of Civil Procedure 19 is contained in the appendix to the Brief of Plaintiff-Appellant Ward.

## INTRODUCTION

This case is the third filed by the same plaintiffs' counsel alleging that Apple Inc. ("Apple") and AT&T Mobility LLC ("ATTM") conspired to monopolize a so-called "aftermarket" by failing to disclose to consumers sufficient detail about a multi-year arrangement under which ATTM would be the sole provider of voice and data services for the iPhone in the United States. The first case (*iPhone I*) was sent to arbitration after the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). The next two cases were substantively identical, except that in an effort to avoid arbitration plaintiffs did not name ATTM as a defendant. ATTM remained everywhere in the complaints, as one would

expect since ATTM provides the allegedly monopolized voice and data services and controls the "unlock codes" at the heart of this case.  The District Court held that ATTM was a "required" party under Rule 19(a)(1)(B) because ATTM claimed an interest in the case and proceeding in ATTM's absence "may as a practical matter impair or impede [ATTM's] ability to protect the interest."  Plaintiffs declined to amend their complaint to add ATTM as a defendant, and the District Court dismissed with prejudice.  This Court should affirm.

The District Court's decision that ATTM is a required party under Rule 19 is reviewed for abuse of discretion, and the Court certainly did not abuse its discretion here.  This case may impair ATTM's ability to protect its interests in at least three ways.

First, Plaintiffs seek an injunction that would require Apple to provide consumers the unlock codes necessary to operate iPhones originally purchased for use on the ATTM network on other carriers' networks.  ██████████████

████████████████████████████████████████████████

██████  This Court has repeatedly declared—in a string of cases stretching back decades—that "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, *all parties who may be affected by the determination of the action are indispensable*."  *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) (emphasis added).  This Court has

2

applied that rule in an antitrust case precisely like this one, where the absent party was an alleged co-conspirator and the goal of the suit was to invalidate the party's rights under an allegedly monopolistic contract. *See Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005).

Second, Plaintiffs' claims will require the District Court to interpret ATTM's contract with consumers, the Wireless Service Agreement ("WSA")—and potentially reach conclusions that could be contrary to ATTM's interests. Plaintiffs recognize that the Court will need to examine what they call the "relevant terms" of the WSA in evaluating the extent to which consumers were on notice of ATTM's exclusivity deal with Apple. The Court will also need to interpret the WSA's arbitration provision, to determine whether Plaintiffs' claims against Apple must be arbitrated. Rule 19(a) makes clear that it is inappropriate and unfair to interpret a bilateral contract in the absence of one of the contracting parties.

Third, this lawsuit threatens to prejudice ATTM's interests in other practical ways. This is a monopolization case and *ATTM is the alleged monopolist*. To prove both monopoly power and anticompetitive conduct, Plaintiffs will argue that ATTM specifically intended to mislead its own customers in an effort to exploit the "aftermarket" for voice and data services for the iPhone. That will obviously require extensive discovery from ATTM, and will require Plaintiffs to introduce evidence that ATTM fleeced its own customers by imposing unfair and

3

anticompetitive fees for international roaming and early termination of their contracts. If Plaintiffs prevail, ATTM will likely suffer significant collateral harms—potentially including future litigation, greater scrutiny from federal and state regulators, and damaged customer relationships. Courts have regularly held that absent parties must be joined in litigation in similar circumstances. *See, e.g.*, *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847-48 (11th Cir. 1999).

Regardless, the District Court's dismissal should be affirmed on the alternative ground that Plaintiffs fail to allege a plausible antitrust claim on the merits. ATTM is clearly not a monopolist in the normal sense. It has strong competition from Verizon and other carriers offering different packages of phones and service. Plaintiffs advance a novel theory that ATTM has monopoly power *over iPhone users only* because it failed to disclose that its exclusive agreement with Apple was longer than the two-year contracts consumers signed when buying their iPhones. Plaintiffs contend this theory is permissible under *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008), but it is not. To the contrary, *Newcal* disallows aftermarket theories where, as here, consumers generally knew or could have "reasonably discover[ed]" that they would have limited aftermarket choices when buying a product (such as an iPhone) in the primary market. *Id.* at 1048.

Plaintiffs have not alleged evidentiary facts that could make out a plausible claim under the *Newcal* standard. To the contrary, the Complaint and judicially noticeable facts demonstrate that the multi-year exclusive agreement between Apple and ATTM was widely publicized and, in fact, common knowledge. Consumers were fully informed—by a label on every iPhone box, by Apple's website, by the WSA, and by countless press reports—that they would be required to use ATTM voice and data services for an extended period, and that iPhones could *not* be unlocked for use on other cellular networks. There is, accordingly, no legal basis for letting this case proceed on a monopolization theory.

## STATEMENT OF JURISDICTION

Apple agrees with the Jurisdictional Statement presented in the Brief of Plaintiff-Appellant Ward.

## STATEMENT OF FACTS

The following statement summarizes the facts underlying the introduction of the iPhone and the complex procedural history underlying this litigation. It is based on Plaintiffs' Complaint, supplemented by materials that are appropriate for judicial notice or have been incorporated into the record of this case by stipulation. *See generally*, *e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 & n.13 (2007); *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012).[1]

---

[1] Apple's motion to dismiss in *iPhone II* (*In re Apple iPhone Antitrust Litig.*,

### A.   Apple And ATTM's iPhone Collaboration

In June 2007, Apple introduced the iPhone, the company's first cellular telephone product.  Complaint ¶¶ 2, 16 (ER 45, 48).  In addition to being a huge commercial success, the iPhone has spurred innovation and greatly enhanced the cellular telephone options available to consumers.

*1. The Apple-ATTM Agreements.*   An important factor in the iPhone's initial success was Apple's strategy of close collaboration with ATTM.  The first iPhone was a Global System for Mobile Communications ("GSM") phone.  In the United States, ATTM and T-Mobile USA are the only carriers with substantial national GSM networks.  After extensive negotiations, Apple chose to launch the iPhone exclusively on ATTM.

In August 2006, Apple and ATTM memorialized their partnership in a multi-year contract (the "2006 Agreement").  Declaration of Eddy Cue (ER 73-77) (attaching excerpts of agreement as Exhibit A); *see also* Complaint ¶¶ 19, 44-54 (ER 48, 53-55).  As part of the 2006 Agreement, Apple granted ATTM the right to

---

No. 4:11-cv-06714-YGR, N.D. Cal.) incorporated "the papers and records in the related case [*iPhone I*]."  Apple Notice of Mot. & Mot. to Dismiss at 1 (*iPhone II*, ECF No. 14).  Plaintiffs accepted that incorporation and relied on materials from the *iPhone I* record themselves.  *See* Joint Case Management Statement at 6-7 (*iPhone II*, ECF No. 22).  The parties' joint stipulation to import the briefing from *iPhone II* into this case therefore must be understood as stipulating that the record documents discussed in that briefing are also available for the parties to rely upon here.

6

be the sole provider of iPhone voice and data services to iPhone consumers for a multi-year period.  Complaint ¶ 46 (ER 54).



2006 Agreement (ER 77); *see also* Complaint ¶ 47 (ER 54).

Apple and ATTM's exclusive partnership became public shortly after the companies finalized their contract.  As Plaintiffs acknowledge, in January 2007—six months before the iPhone first became available to consumers—Apple publicly announced that "it had entered into an exclusive agreement making ATTM the only authorized provider of wireless voice and data services for iPhones in the United States."  Complaint ¶ 44 (ER 53).  Apple also informed all iPhone

7

consumers—via a label appearing on the iPhone box itself—that the iPhone would only work if they obtained both (1) an initial two-year service plan from ATTM, and (2) a follow-on plan with ATTM "on expiration" of that initial agreement. *See* Request for Judicial Notice, Exh. B ((*In re Apple & AT&TM Antitrust Litig.* ("*iPhone I*")*,* No. 5:07-cv-05152-JW, N.D. Cal.), ECF No. 123-2). Apple's website also included the following: "Can I 'unlock' my iPhone for use with another wireless provider? No, AT&T is the exclusive wireless provider for the iPhone in the United States." Declaration of Lola A. Kingo, Exh. K (*iPhone I*, ECF No. 356-3). The agreement and restrictions on unlocking the iPhone were widely reported in the press.[2]

On January 1, 2011, Apple and ATTM replaced the 2006 Agreement with a new contract (the "2011 Agreement"). Cue Decl. (attaching excerpts of iPhone Agreement as Exhibit B) (ER 73-74, 79-80); *see also* Complaint ¶¶ 8 n.1, 19 (ER 47, 48). The 2011 Agreement ended ATTM's exclusivity, but it retained ATTM's role as a non-exclusive iPhone retailer. Complaint ¶¶ 8 n.1, 19 (ER 47, 48). To protect ATTM's contractual rights vis-a-vis its service customers, Apple again promised ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] Apple has included 15 press stories discussing the multi-year exclusivity agreement in the Request for Judicial Notice ("RJN") filed along with this brief.

8

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ 2011 Agreement (ER 80); *see also* Complaint ¶¶ 54, 77 (ER 55, 59).

*2. **The ATTM Wireless Service Agreement With Consumers.*** ATTM required all of its iPhone customers to accept a contract—the WSA—containing terms and conditions governing ATTM's provision of voice and data services. *See* WSA (*iPhone I*, ECF No. 505-1). For example, the WSA addressed the duration of the consumer's service contract, the fees associated with early termination of the contract, and the roaming charges associated with use of an iPhone while the consumer is traveling overseas. *Id.*

The WSA made explicit that "[e]quipment purchased for use on AT&T's system [*i.e.*, the iPhone] is designed for use *exclusively* on AT&T's system." WSA at 3 (emphasis added). It thereby provided consumers with further confirmation—supplementing Apple's own disclosures—that the only way to operate their iPhones would be under service contracts with ATTM.

The WSA also included a provision requiring ATTM and consumers to arbitrate all "claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." WSA at 4. It made clear that the contractually-required

9

arbitration involves "more limited discovery than in court," allows for only "very limited" judicial review, and bars "class arbitrations" and "class actions." *Id*.

## B.  Procedural Background

This case is the third putative class action filed by the same counsel alleging that Apple and ATTM's collaboration violates the Sherman Act.  All of these cases rely on the same improbable allegation that ATTM obtained monopoly power over iPhone users by fooling them into thinking that they would be able to use their ATTM iPhones with services provided by ATTM's rival carriers.

*1.* **iPhone I.**  Shortly after the first sale of the iPhone in 2007, Plaintiffs' counsel in this case filed a class action against Apple and ATTM.  The complaint alleged that Apple and ATTM had conspired to monopolize a so-called "aftermarket" for iPhone voice and data service (*i.e.*, the service provided by ATTM).  *In re Apple & ATTM Antitrust Litig.,* 826 F. Supp. 2d 1168, 1170-72 (N.D. Cal. 2011) (*iPhone I*).[3]  Plaintiffs argued that "although they were of the expectation that they would be under contract with ATTM for two years, they were unaware that Apple and ATTM had agreed, without Plaintiffs' knowledge or consent, to make ATTM the exclusive provider of voice and data services for the

---

[3]    As discussed at length below, an "aftermarket" is "a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 564b (last updated Apr. 2013).

iPhone for five years." *Id*. According to plaintiffs, blocking consumers from using their iPhones on wireless networks maintained by ATTM's competitors constituted unlawful monopolization of the alleged aftermarket.

Apple and ATTM moved to dismiss the *iPhone I* complaint. Apple challenged plaintiffs' monopoly power theory, arguing *inter alia* that *nondisclosure* of the exclusivity arrangement could not establish monopoly power in the antitrust sense. Apple also challenged plaintiffs' allegations of a secret plot to monopolize the aftermarket by pointing to voluminous evidence—including Apple's public pronouncements, the label on the iPhone box, and various press reports—that consumers knew that ATTM service would be required to activate and use an iPhone both before and after expiration of the WSA. Plaintiffs opposed the motion by arguing that the public disclosures were insufficient, and that Apple and ATTM were liable for monopolization unless consumers, when they purchased their iPhones, knowingly agreed to the full duration of the exclusivity Apple had granted to ATTM. Plaintiffs argued that the WSA established that consumers did not consent to ATTM's exclusivity beyond its two-year term.

The district court sided with plaintiffs. Presuming their allegations to be true for purposes of the motion, the court held that the case should proceed because Apple had merely raised a "factual dispute" on the "dispositive issue," which it identified as "whether Plaintiffs [had] knowingly placed [Defendants] in a

monopoly position in the alleged voice and data services aftermarket." *In re Apple & AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1303-06 (2008) ("*iPhone I*") (relying principally on *Newcal*) (internal quotation marks omitted).

Plaintiffs then sought class certification, again relying on the terms of the WSA. They argued that "[b]ecause Plaintiffs and all other Class members signed the *same integrated two-year service contracts*, whether they *contractually agreed to give monopoly power to Apple and ATTM* in the iPhone voice and data aftermarket … can and should be answered the same way for everyone." Pls.' Reply Mem. In Support of Class Cert. at 10 (*iPhone I*, ECF No. 422); *see also id.* at 1. They further declared that under *Newcal*, the iPhone box, Apple and ATTM's statements regarding unlocking, ATTM's advertisements, and other public information were "utterly irrelevant" because the terms of ATTM's WSA with its customers were all that mattered. *Id.* at 2. Finally, Plaintiffs contended that "the definition of the aftermarket in this case depends upon whether Plaintiffs or any other members of the Class entered into *binding written contracts* that obligated them to use ATTM for voice and data service for the life of the iPhones," and that "the iPhone voice and data aftermarket is predicated on those two-year service agreements." *Id.* at 7, 8 n.4 (emphasis added).

The district court accepted plaintiffs' description of their WSA-based claims, holding that the issue "can be analyzed on a class-wide basis" in terms of

"whether the purchase of an iPhone constitutes a binding contractual agreement to consume … ATTM's voice and data services in the aftermarket." *In re Apple & ATTM Antitrust Litig.*, No. C 07-05152 JW, 2010 U.S. Dist. LEXIS 98270, at *35-36 (N.D. Cal. July 8, 2010). At plaintiffs' request, the court even defined the certified class by reference to ATTM's WSA, as "All persons who purchased or acquired an iPhone in the United States and entered into a two-year agreement with Defendant AT&T Mobility, LLC for iPhone voice and data service any time from June 29, 2007 to the present." *Id.* at *52. This Court denied interlocutory review of that decision in October 2010.

The following year, the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which addressed the same arbitration provision in ATTM's WSA and held it is legally enforceable. Soon thereafter, ATTM and Apple both moved to compel arbitration and to decertify the *iPhone I* class. ATTM invoked the WSA's arbitration provision, and Apple argued that plaintiffs were equitably estopped from refusing to arbitrate with Apple because their claims were inextricably intertwined with the WSA.

The district court granted the motions and stayed the cases against both defendants. It explained that "Plaintiffs themselves have contended throughout this litigation that their antitrust and related claims against Defendant ATTM and Defendant Apple arise from their respective ATTM service contracts," and that

13

Plaintiffs could not disclaim reliance on the WSA in order to avoid arbitration against Apple. *In re Apple & ATTM Antitrust Litig.*, 826 F. Supp. 2d at 1178.

Since this decision, the *iPhone I* plaintiffs have taken no steps to proceed with the arbitration. *See* Ward Br. 6.

*2.* **iPhone II.** In December 2011, four weeks after the order compelling arbitration of *iPhone I*, Plaintiffs' counsel filed a second class action, on behalf of a new group of named individuals. The *iPhone II* complaint was identical in all material respects to the *iPhone I* complaint. But in an effort to avoid arbitration, it dropped ATTM as a defendant and relied on the WSA without mentioning it by name.

Despite this cosmetic modification, the focus of plaintiffs' entire case was still ATTM, its exclusivity agreement with Apple, and the terms of the WSA. Once again, plaintiffs claimed a conspiracy between ATTM and Apple to monopolize a claimed aftermarket for voice and data services. *In re Apple iPhone Antitrust Litig.*, 874 F. Supp. 2d 889, 891-93 (N.D. Cal. 2012) (*iPhone II*). Once again, they contended that the WSA did not establish any explicit contractual consent by consumers to ATTM's exclusive contract with Apple. *Id*. And once again, they repeatedly invoked the WSA's terms to establish the elements of the aftermarket monopolization claim. *See, e.g.,* Consolidated Class Action Complaint ¶¶ 8, 58 (*iPhone II*, ECF No. 26).

14

Apple moved to dismiss the complaint under Rule 12(b)(7) because Plaintiffs had failed to join ATTM, a necessary party under Rule 19. It also moved to dismiss for failure to state a claim and to compel arbitration, for similar reasons to those it had asserted in *iPhone I*.

Apple's Rule 12(b)(7) motion pointed out that the *iPhone II* lawsuit threatened ATTM's rights under its agreements with Apple. As Apple explained, plaintiffs sought declaratory relief and an injunction that would effectively invalidate those agreements and ████████████████████████

████████████████████████████████████

████████████████. Apple Mem. ISO Mot. to Dismiss Consolidated Complaint at 8, 9, 10, 14 & n.5 (*iPhone II*, ECF No. 37). Apple also noted that ATTM was necessary because it was the alleged monopolist in a conspiracy-to-monopolize claim, and because the case would necessarily require the court to examine and interpret ATTM's own contract with consumers—the WSA. *Id*. at 9-16. Apple's motion attached a declaration from ATTM's counsel announcing ATTM's interest in the litigation. ATTM *iPhone II* Decl. at 1 (ER 82).

In opposing Apple's Rule 12(b)(7) motion, plaintiffs claimed that they were unlike the *iPhone I* plaintiffs insofar as they "in no way rely upon the WSA [wireless service agreement] in the new case." Pls.' Opp. to Mot. to Dismiss at 18 (*iPhone II*, ECF No. 44). But they then demonstrated precisely the opposite by

15

laying out what plaintiffs themselves called the "*relevant* terms of ATTM's WSA," including the length of the contract, the early termination provision, and the details of international roaming charges. *Id*. at 11 (emphasis added). Plaintiffs asserted that Apple and ATTM had "judicially admitted" the WSA's terms in *iPhone I*, and they further noted that those terms "were disclosed and readily available on ATTM's website" throughout the relevant period. *Id*. But plaintiffs nowhere explained how they could rely on the "relevant terms" of the WSA while simultaneously claiming that the WSA was "not part of this case" and "not pertinent" to their claims. *Id*. at 10, 11.

The district court granted Apple's Rule 12(b)(7) motion, though it also gave plaintiffs leave to amend their complaint to add ATTM. *iPhone II*, 874 F. Supp. 2d at 899, 901-02. The court explained that to evaluate plaintiffs' antitrust claim against Apple it would have "to evaluate ATTM's conduct, insofar as [p]laintiffs allege, *inter alia*, that ATTM unlawfully achieved market power in th[e] Aftermarket due to the conspiracy and thereby foreclosed other companies from entering the market." *Id*. at 900. It concluded that "[s]uch an evaluation of ATTM's conduct would necessarily implicate the interests of ATTM," thereby making ATTM a necessary party under Rule 19. *Id*. The Court went on to hold

16

that "it is feasible for ATTM to be joined," and thus that "ATTM is a necessary party which can, and therefore must, be joined" under Rule 19. *Id.* at 901.[4]

The *iPhone II* plaintiffs chose not to name ATTM as a defendant in their amended complaint. Apple's motion to dismiss certain distinct claims concerning software applications in the amended complaint is now pending in the district court, so that case remains interlocutory.

**3. *iPhone III.*** In October 2012, Plaintiffs' counsel then filed *iPhone III*— the case now before this Court on appeal. This case is virtually identical to *iPhone II*, with the only real differences being a change in the named Plaintiffs and the fact that Plaintiffs do not raise the separate claims relating to software applications.

Thus, once again, Plaintiffs omit ATTM and allege that Apple violated the Sherman Act by "conspiring with ATTM to monopolize the aftermarket for voice and data services for iPhones." Complaint ¶ 7 (ER 46). Yet again, Plaintiffs take direct aim at ATTM's contract with Apple, calling it "an illegal agreement that violates the antitrust laws." Ward Br. 31; Complaint ¶¶ 2, 6, 21, 44-54 (ER 45-46, 48, 53-55). Again, Plaintiffs seek injunctive relief that would prevent Apple from implementing its 2006 and 2011 Agreements with ATTM, including an order that would eliminate ATTM's contractual right to control the iPhone unlock codes by

---

[4] The Court denied, without prejudice, Apple's motion to compel arbitration and denied as "premature" Apple's motion to dismiss for failure to state a claim. *iPhone II*, 874 F. Supp. 2d at 898-99, 901 n.27.

17

"requiring Apple to provide the iPhone SIM unlock codes to members of the class and other iPhone consumers immediately upon request." Complaint ¶ 8, Requests for Relief (ER 46, 59-60).

Plaintiffs also continue to rely heavily on the WSA. As before, they define their putative class by reference to those who "paid for voice and data service from ATTM," which for the relevant period was "the exclusive provider of cell phone voice and data services for iPhone customers." Complaint ¶¶ 1-2, 58 (ER 45, 56). The supposed conspiracy is again claimed to turn on whether consumers provided "contractual consent to the claimed five-year Exclusivity Agreement between Apple and ATTM, the effect of which was to lock consumers into using ATTM as their voice and data service provider, even if they wished to discontinue their use of ATTM service." Complaint ¶¶ 6 (ER 46); *see id.* ¶¶ 21-22 (ER 48-49). The contract in question is ATTM's WSA.

Plaintiffs' counsel filed this suit in order to create a vehicle for obtaining immediate appellate review of the district court's *iPhone II* order, and they offered to stipulate to dismissal of this case for the reasons stated in that order. Apple agreed to this proposal, and the parties submitted a joint stipulation and proposed order incorporating the briefing and decision from *iPhone II*. Stipulation and Order Dismissing Plaintiffs' Complaint (ER 3-7).[5] In December 2012, the District

---

[5] The stipulation attaches a second declaration from ATTM's counsel further

Court accepted the stipulation and entered final judgment, dismissing *iPhone III* with prejudice for Plaintiffs' failure to join ATTM. Judgment (ER 2). Plaintiffs appealed.

## SUMMARY OF ARGUMENT

The District Court held that ATTM was a required party under Rule 19(a), and it dismissed the case under Rule 12(b)(7)—with prejudice—because Plaintiffs chose not to join ATTM. That decision was not an abuse of discretion, and it should be affirmed. Alternatively, this Court should reach the merits and dismiss the case for failure to state a claim under Rule 12(b)(6).

I. Rule 19(a) makes clear that joinder is necessary when (1) an absent party claims an interest in the action, (2) disposing of the case without that party threatens to "impair" or "impede" those interests, and (3) joinder of the party is feasible.

This is a case about ATTM's alleged monopoly, first filed against ATTM, rooted in ATTM's contracts with consumers and with Apple, and in which Plaintiffs seek injunctive relief that would destroy ███████████████████ ███████████████████████████████. Plaintiffs' lawsuit will also require the District Court to construe the terms of ATTM's WSA with consumers—including

---

attesting to ATTM's awareness of, and interest in, this case. *See* ATTM *iPhone III* Decl. ¶ 2 (ER 43) (noting that Plaintiffs are challenging validity of ATTM's respective agreements with Apple and with its customers).

the WSA's arbitration provision. ATTM has *twice* unambiguously asserted its interests in not having this case move forward in its absence, and no wonder. Plaintiffs dropped ATTM as a party merely as an effort to avoid arbitration. In all other respects the case is as much about ATTM as it was when *iPhone I* was filed.

This Court has consistently recognized that an absent party's contractual interests are *always* protected by Rule 19(a), and that it is unfair and inappropriate for an absent party to lose rights under a contract without being joined as a party to the action. This rule applies to antitrust cases—including in circumstances where the absent party is an alleged co-conspirator. *See Wilbur*, 423 F.3d at 1112-14.

Plaintiffs' suit also threatens ATTM's interests in other ways that go far beyond the usual interests shared by alleged joint tortfeasors. Because Plaintiffs must prove that ATTM specifically intended to monopolize the alleged aftermarket for iPhone voice and data services, ATTM's conduct will be the central focus of discovery and any trial. *ATTM is the alleged monopolist*—not Apple, which does not even participate in any market for cellular voice and data service. A verdict in favor of Plaintiffs in a massive class action like this one would represent a high-profile determination that ATTM, despite its numerous competitors, has monopoly power and deliberately deceived its own customers. Any such outcome could produce scrutiny and follow-on litigation from additional plaintiffs and government regulators. This Court and others have recognized that practical

20

consequences like these are also cognizable forms of prejudice under Rule 19(a). *See, e.g.*, *Laker Airways*, 182 F.3d at 847-48; *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002).

ATTM's joinder in this case is plainly feasible, as it would not deprive the District Court of personal or subject-matter jurisdiction or raise concerns about improper venue.  And even if joinder were not feasible, dismissal is still the proper course under Rule 19(b), given the scope of potential prejudice to ATTM and the fact that Plaintiffs have the right to bring their claims—against both Apple and ATTM—in arbitration.  Either way, Rule 19 bars this case from proceeding in federal court without ATTM.

II. In the alternative, this Court can and should dismiss Plaintiffs' aftermarket monopolization claim under Rule 12(b)(6).  Under this Court's decision in *Newcal*, their claim that ATTM has monopoly power in the alleged "aftermarket" for voice and data services is only viable if Plaintiffs can show (among other things) that "consumers could not, at the time of purchase, reasonably discover" that buying an iPhone would require them to rely on ATTM for voice and data services.  513 F.3d at 1048.  Plaintiffs' counsel have distorted this into a requirement that a company in ATTM's position must obtain *express* consent—and perhaps even *contractual* consent—to the alleged aftermarket monopoly.  This is not what *Newcal* holds; in fact it holds nearly the opposite.

21

Furthermore, Plaintiffs' allegations that ATTM and Apple hid their exclusive relationship are completely implausible in light of the extensive—and undisputed—facts showing that Apple and ATTM repeatedly disclosed the fact of their long-term exclusivity arrangement, which was also the subject of widespread press reports. Indeed, Apple expressly informed iPhone consumers that they would need to purchase additional ATTM service plans after the expiration of their initial two-year service contracts in order to continue operating their devices. And both Apple and ATTM told iPhone purchasers that iPhones would not be unlocked to be used on other cellular networks. Dismissal is appropriate because Plaintiffs' monopolization claim fails as a matter of law in light of Plaintiffs' own allegations and judicially noticeable facts.

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DISMISSED THIS CASE BECAUSE ATTM IS A "REQUIRED" PARTY UNDER RULE 19(A)

Rule 19(a) mandates the joinder of "required" parties, including any party that "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may … as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). The focus of this inquiry is on prejudice to the absent party "*as a practical matter*." *Am. Greyhound Racing*, 305 F.3d at 1024. It is settled law that

a party can have its interests impaired for Rule 19(a)(1)(B)(i) purposes even though it would not be formally bound by the outcome of the case under principles of *res judicata* or collateral estoppel. *Id*.

If joinder of a required party is feasible, that party "must be joined" in the litigation, Fed. R. Civ. P. 19(a)(1), or else the case must be dismissed under Rule 12(b)(7). If joinder of the required party is not feasible, then the court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). This Court reviews a district court's Rule 19 analysis for abuse of discretion. *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1136 (9th Cir. 2005).

The District Court's decision to dismiss this case was not an abuse of discretion, and it should be affirmed.

## A. ATTM Has Unambiguously Claimed An Interest In This Case

For ATTM to qualify as a "required" party under Rule 19(a)(1)(B), it must first "claim[] an interest relating to the subject matter of the action." ATTM has unambiguously done so here—at least twice. In *iPhone II*, ATTM asserted its interest through a declaration submitted by its counsel, Shari Lahlou. ATTM *iPhone II* Decl. (ER 81-82). In *iPhone III*, ATTM also submitted a separate declaration asserting its interest, again through Ms. Lahlou. ATTM *iPhone III* Decl (ER 42-43).

23

The two declarations by ATTM's counsel expressly state that ATTM has important interests that are potentially threatened by Plaintiffs' litigation against Apple. *See* ATTM *iPhone III* Decl. ¶ 2 (ER 43) ("ATTM has an interest in these claims …."); ATTM *iPhone II* Decl. ¶ 2 (ER 82) ("ATTM has an interest in this case …."). The *iPhone II* declaration notes that ATTM's interests stem from Plaintiffs' accusation "that ATTM is a monopolist" and their antitrust challenge to "the service ATTM provides to [its] customers using iPhones." ATTM *iPhone II* Decl. ¶ 2 (ER 82). The *iPhone III* declaration adds detail, asserting that ATTM's interests are threatened by (1) Plaintiffs' challenge to the exclusivity agreement between Apple and ATTM; (2) their interpretation of the terms of the WSA; (3) their "inaccurate characterization of ATTM's pro-competitive customer agreements as violations of the antitrust laws"; and (4) their effort "to avoid contractually required arbitration." ATTM *iPhone III* Decl. ¶ 2 (ER 43).

Despite this unambiguous language in ATTM's declarations, Plaintiffs inexplicably assert that ATTM has *not* claimed an interest in this case. *See* Ward Br. 19-20 ("ATTM's decision here" is "not to claim an interest"); *id.* at 20 ("ATTM chose not to claim an interest in the action"); *id.* at 21 ("[T]he Lahlou declaration actually disclaims that ATTM has asserted an interest in this case …."). But it is hard to imagine how ATTM could have more clearly informed the District

Court that it had an interest in these cases than by having its counsel file two declarations expressly saying so.

Furthermore, the declarations state the obvious. It is impossible to believe that ATTM *would not* have an interest in this case, given its substance and history. Plaintiffs appear to imply that ATTM was required to seek intervention, *see* Ward Br. 20, but they are wrong. Rather, ATTM merely needed to "claim[] an interest," the sufficiency of which is then evaluated under Rule 19(a)(1)(B)(i). *See, e.g.*, *Wilbur*, 423 F.3d at 1111-16 (dismissing antitrust case under Rule 19 for failing to join required party, despite fact that party had chosen not to intervene); *Shimkus v. Gersten Cos.*, 816 F.2d 1318 1321-22 (9th Cir. 1987) (ordering joinder despite lack of effort to intervene).[6] ATTM asserted its interest through its counsel, as it had every right to do.

Plaintiffs challenge the admissibility of Ms. Lahlou's declaration in *iPhone II* because it supposedly (1) makes statements concerning ATTM's knowledge, intent, and motive without proper foundation; and (2) contains ATTM's counsel's conclusions, opinions, and legal argument. Ward Br. 21-22.

---

[6] Requiring absent parties to seek intervention would render Rule 19(a)(1)(B)(i) almost entirely superfluous. The core requirement for intervention as of right under Rule 24(a)(2)—a party with an interest that may be practically impaired or impeded absent its participation in the case—is virtually identical to the definition of a "required" party under Rule 19(a)(1)(B)(i). *See, e.g.*, *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 134 n.3 (1967) (citing Federal Rule of Civil Procedure 24 advisory committee's notes on 1966 amendments).

This is senseless. Plaintiffs have not challenged the *second* Lahlou declaration, which ATTM submitted in this case, *iPhone III,* and which asserts the same interests in greater detail.

In any event, the *iPhone II* declaration *is* admissible. Plaintiffs concede that Ms. Lahlou is counsel for ATTM, which by itself lays the foundation to establish her knowledge of ATTM's assertion of interest. *See generally* Restatement (Third) of Law Governing Lawyers §§ 25, 26, 27 (2000) (applying agency principles and recognizing that attorneys have authority to make representations to courts on behalf of their clients in the context of litigation). Ms. Lahlou represented ATTM in *iPhone I.* To the extent Plaintiffs are right that "'the declarant must state facts showing his or her connection to the matters stated,'" Ward Br. 21 (citation omitted), Ms. Lahlou has undeniably done so.

As for Plaintiffs' charge that the declaration conveys ATTM's legal conclusions, *id.* at 22, such conclusions are entirely appropriate under Rule 19. After all, the whole purpose of the declaration was to inform the District Court of the various ways in which ATTM's legal interests were potentially threatened by this litigation. That is what it means for the absent party to "claim[] an interest" in the case. Notably, neither of Plaintiffs' (unpublished) authorities arose in the context of an assertion of interest under Rule 19.

Plaintiffs also point out that ATTM will likely seek to compel arbitration if it is joined.  *Id.* at 20.  But they fail to explain why ATTM's ultimate preference for arbitration undermines its counsel's express assertion of an interest in "the subject matter" of this case, as Rule 19(a)(1)(B) requires.  Plaintiffs cite no authority for their argument that a party's right to compel arbitration in response to a lawsuit somehow precludes it from claiming an interest in that lawsuit under Rule 19, and Apple is aware of none.

This is not a case such as *United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 908 (9th Cir. 1994) (cited at Ward. Br. 22), where the absent party disclaimed any interest in the case by voluntarily stipulating to its own dismissal.  ATTM has affirmatively and unambiguously *asserted* its interests in this case, and those interests are obvious and undeniable.  This Court should reject Plaintiffs' strained and implausible attempt to pretend otherwise.

### B.   Adjudicating This Case Without ATTM Will Impair ATTM's Ability To Protect Its Contractual Interests

If Plaintiffs succeed in this case, they will obtain a declaration that Apple and ATTM conspired to make ATTM a monopolist and an injunction ordering Apple to provide consumers with unlock codes that are ATTM's property and contractually controlled exclusively by ATTM.  That outcome would undeniably impair ATTM's rights and interests, most notably in its contracts with Apple and in its WSA with ATTM's own customers.

27

### 1. An Absent Party Is "Required" If The Litigation Threatens To Impair That Party's Contractual Rights

Under Rule 19(a)(1)(B)(i), an absent party is "required" if it has "an interest relating to the subject of the action" and adjudicating the case in its absence may … as a practical matter impair or impede the [party's] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). The Rule's language plainly encompasses circumstances when the absent party has contractual rights that may be threatened as a consequence of the litigation.

That straightforward conclusion is supported by decades of precedent. As this Court has explained, "'a party to a contract is *necessary*, and if not susceptible to joinder, *indispensable* to litigation seeking to decimate that contract.'" *Wilbur*, 423 F.3d at 1113 (emphasis added) (quoting *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002). The Court has described this rule as a "'fundamental principle'" with deep historical roots. *Id*. "No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975). The cases for that proposition are legion.[7]

---

[7] *E.g.*, *Cachil Dehe Band of Wintun Indians v. California*, 547 F.3d 962, 970-71 (9th Cir. 2008) (absent parties required when lawsuit affects their "substantial"

The application of this rule turns on whether the relief requested in the lawsuit would impair the absent party's contractual rights, *not* on whether the claim alleges a breach of contract. The Court regularly enforces the rule when the case involves constitutional or statutory claims. *See, e.g.*, *Wilbur*, 423 F.3d at 1105 (Sherman Act); *Dawavendewa*, 276 F.3d at 1153 (Civil Rights Act)*; Kescoli v. Babbitt*, 101 F.3d 1304, 1308 (9th Cir. 1996) (Surface Mining Control and Reclamation Act); *Manybeads v. United States*, 209 F.3d 1164, 1165 (9th Cir. 2000) (First Amendment); *Am. Greyhound Racing*, 305 F.3d at 1020-21 (Equal Protection Clause and Indian Gaming Regulatory Act, among others).

This Court's decision in *Wilbur* is particularly instructive here because—like this case—it involved a Sherman Act conspiracy-to-monopolize claim in which the absent party was an alleged co-conspirator. *Wilbur*, 423 F.3d at 1104-05; *Wilbur* Complaint ¶ 6, No. CV03-0873 (W.D. Wash. filed Apr. 11, 2003). The *Wilbur* plaintiffs were members of the Swinomish Indian Tribe and operators of a retail store located on the Swinomish Indian Reservation. *Wilbur*, 423 F.3d at 1104-05. The State of Washington entered into a compact with the Tribe by which the Tribe—instead of the State—would impose and collect taxes on the sale of

rights "aris[ing] from terms in bargained contracts"); *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022-24 (9th Cir. 2002) (same point); *Manybeads v. United States*, 209 F.3d 1164, 1166 (9th Cir. 2000) (absent party necessary when plaintiff sought to "undo[]" agreements to which it was a party,); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) (same point); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1044 (9th Cir. 1983) (same point).

cigarettes by retail stores located on the reservation. *Id*. at 1104-05, 1112-13. Plaintiffs sued the State, alleging that the compact reflected an unlawful antitrust conspiracy between the State and the Tribe to monopolize the sale of cigarettes on the reservation. *Id*. at 1104-05; *Wilbur* Complaint ¶ 6 (alleging "a conspiracy by Defendants and the Swinomish Tribe to monopolize and set the retail price of cigarettes"). Along with other relief, the plaintiffs sought an injunction against any enforcement of the compact. *Wilbur*, 423 F.3d at 1112-13. But the plaintiffs did not sue the Tribe, even though the Tribe was an alleged co-conspirator in the monopolization scheme. *Id*.

This Court held that the Tribe was a necessary and indispensable party under Rule 19, and it ordered the case dismissed. *Id.* at 1112-16. This Court explained that the Tribe's "interest in retaining the rights granted by the Compact" was cognizable under Rule 19(a), and it noted that "[i]f the Compact is invalidated," the result would "threaten[] to impair the [Tribe's] contractual interests" because the Tribe would no longer have the exclusive right to impose the cigarette taxes. *Id*. at 1112-13. In concluding that the Tribe was a required party, the Court relied on its prior decisions in a long line of cases—including *Dawavendewa*, *Manybeads*, *Kescoli*, *Northrup*, and *Lomayaketwea*, all cited above—establishing the "fundamental principle" that "a party to a contract is necessary … to litigation seeking to decimate that contract." *Id*. at 1113-14.

*Wilbur* disproves Plaintiffs' core argument on appeal, which is that alleged antitrust co-conspirators are never necessary parties under Rule 19(a). *See* Ward Br. 10, 15-16, 26. *Wilbur* makes clear that if the absent co-conspirator has contractual rights that are threatened by the litigation, then the co-conspirator *is* a necessary party under Rule 19. None of Plaintiffs' cases address this circumstance, or otherwise challenge this Court's longstanding recognition of the fundamental principle—"deeply imbedded in the common law"—that "in an action to set aside a lease or a contract, *all parties* who may be affected by the determination of the action are indispensable." *Lomayaktewa*, 520 F.2d at 1325 (emphasis added).

Other authority from this circuit likewise rejects Plaintiffs' contention that antitrust co-conspirators are not necessary parties, even when their contractual rights are at stake. In *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 104-06 (C.D. Cal. 1971), the court faced the same situation as in *Wilbur*—a Sherman Act conspiracy-to-monopolize claim in which one of the alleged co-conspirators was omitted from the lawsuit. Echoing Plaintiffs' assertions here, the *Occidental Petroleum* plaintiff argued that the co-conspirator was not a necessary party because it was a joint tortfeasor. *Id*. at 105-06. The court flatly rejected that argument. *Id*. at 106. It acknowledged that "generally" antitrust co-conspirators "need not be joined" merely because they are alleged co-

conspirators, but explained that joinder is necessary if the co-conspirator's contractual rights "stand to be abridged" by the litigation. *Id*. at 105-06. The court held that in such circumstances, the absent party's "status as a joint tortfeasor would not as a practical matter negate its status as a contractual party, with interests that are covered by Rule 19(a)." *Id*. at 106.[8]

Plaintiffs misrepresent the holding of *Occidental Petroleum* by suggesting that the court "concluded that the non-party was necessary under Rule 19 *because Occidental had asserted contract claims*," and that the decision applied "the basic rule that joinder of antitrust co-conspirators is *not* necessary." Ward Br. 27 (emphases added); *see also id.* at 26 (asserting that *Occidental Petroleum* held that "joinder was necessary only as to claims *other than* antitrust claims"). That is completely wrong. *Occidental Petroleum* involved only antitrust claims. *Occidental Petroleum*, 331 F. Supp. at 95 ("This is a private antitrust suit for treble damages and an injunction …."); *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 461 F.2d 1261, 1261 (9th Cir. 1972) ("Appellants filed a private antitrust action …."). The breach of contract claims to which Plaintiffs appear to be

---

[8] *Wilbur* and *Occidental Petroleum* have both been influential, and their holding has been adopted in other jurisdictions. *See*, *e.g.*, *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999) (adopting *Occidental Petroleum* rule); *Matheson v. Gregoire*, 161 P.3d 486, 492-93 (Wash. Ct. App. 2007) (applying *Wilbur* and holding that absent antitrust co-conspirator was necessary party under state law because requested relief would have impaired the party's contractual interests).

referring were filed not as part of the federal lawsuit, but rather in a separate action "*in California state court*." *Occidental Petroleum*, 331 F. Supp. at 95 (emphasis added).

Contrary to Plaintiffs' assertion, therefore, *Occidental Petroleum* does *not* stand for the proposition that "joinder of antitrust co-conspirators is not necessary." Ward Br. 27. Rather, it establishes that joinder of such co-conspirators *is* necessary when their "contractual rights stand to be abridged by an injunction" against the alleged antitrust violation. *Occidental Petroleum*, 331 F. Supp. at 105. That is precisely the rule that this Court applied in *Wilbur*—and that it must now apply here.

Finally, Plaintiffs also support their interpretation of Rule 19(a) by citing the 1966 Advisory Committee notes, which say that "a tortfeasor with the *usual* 'joint-and-several' liability" is not a required party. Ward Br. 30. But that statement simply indicates that the tortfeasor's mere *status as a tortfeasor* does not alone automatically make him necessary to the case. As noted above, the tortfeasor can be required for other reasons—for example, if the lawsuit threatens to deprive him of his contractual rights. *Wilbur*, 423 F.3d at 1112-13; *Occidental Petroleum*, 331 F. Supp. at 106. Indeed, the Advisory Committee's emphasis on "joint-and-severable liability" indicates that its goal was to clarify Rule 19(a)(1)(A), which treats a party as required when that party's presence is necessary for the court to

"accord complete relief among existing parties." The fact that the named defendant(s) and an absent tortfeasor are jointly and severally liable generally means that complete relief can be ordered without joinder, but is entirely irrelevant to Rule 19(a)(1)(B)(i), which is concerned *not* with ensuring adequate relief to the plaintiff, but rather with avoiding unfair prejudice to the absent party.

### 2. Plaintiffs' Request For Injunctive Relief Threatens To Impair ATTM's Rights In Its Contracts With Apple

Under *Wilbur* and the other Rule 19(a) cases discussed above, ATTM is a required party if Plaintiffs seek relief that would impair ATTM's contractual rights. That test is clearly satisfied here, because Plaintiffs seek to deprive ATTM of its rights— ███████████████████████████████████████████ ██████████████████████.

Long before there was an iPhone, it was the standard practice in the mobile telephony business to treat unlock codes as "owned" by the network service provider (*i.e.*, the carrier) rather than the handset maker. ████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████████. Yet Plaintiffs

seek an injunction "[o]rdering Apple to provide the unlock code upon request to all members of the Class who purchased an iPhone."  Complaint, Requests for Relief ¶ b (ER 59-60); *see also id*. ¶ 8 (ER 46) (seeking an order "requiring Apple to provide the iPhone SIM unlock codes to members of the class and other iPhone consumers immediately upon request").

If granted, Plaintiffs' proposed injunction would ███████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ Just as in *Wilbur*, "disposition of this action in [ATTM's] absence may impair or impede [ATTM's] ability to protect its interest" in "retaining the rights granted" by its contract.  *Wilbur*, 423 F.3d at 1112.  ██████████████████████████ "is an integral part of the existing compacts" with Apple, and there is accordingly "no question" that invalidating the relevant provisions "renders the compacts less valuable" to ATTM—and accordingly makes ATTM a required party under Rule 19.  *Am. Greyhound Racing*, 305 F.3d at 1023.

Plaintiffs do not—and cannot—deny that if they succeed in their antitrust challenge, ATTM will lose certain rights it currently possesses under its agreements with Apple.  After all, just as in *Wilbur* and *Occidental Petroleum*, denying the alleged antitrust co-conspirators the benefit of their allegedly unlawful contracts is the whole purpose of Plaintiffs' case.  Plaintiffs refer to Apple's

contractual collaboration with ATTM as an "illegal agreement that violates the antitrust laws," and they also make clear that if the agreement is deemed invalid it will be "void under California law." Ward Br. 31 & n.10. Furthermore, "freeing iPhones" from ATTM's allegedly unfair and anticompetitive unlocking policies is the specific object of this case. It is hard to imagine a more direct intrusion on ██████████████████████████████████████████.

Plaintiffs offer three weak responses. First, they state that ATTM has not asserted an interest in protecting these particular rights. Ward Br. 32-33 n.12. If the suggestion is that ATTM does not really care about ████████████████ ████████████ or the legality of its agreement with Apple, that is simply specious. ATTM vigorously resisted Plaintiffs' attacks on those practices in *iPhone I*, and both of ATTM's declarations assert that ATTM still has an interest in opposing Plaintiffs' antitrust allegations, including those which challenge—and seek to invalidate—the relevant provisions of ATTM's agreements with Apple. ATTM *iPhone III* Decl. ¶ 2 (ER 43) (specifically asserting an interest in opposing Plaintiffs' effort to invalidate the "terms of the agreement" by which Apple and ATTM collaborated on the iPhone); ATTM *iPhone II* Decl. ¶ 2 (ER 82); *see also* Complaint ¶¶ 8, 47, 54, Requests for Relief (ER 46, 54, 55, 59-60).

Second, Plaintiffs complain that the record contains only excerpts of the 2006 and 2011 Agreements. Ward Br. 31. That is true, but ████████████████

36

█████████████████████████████████████████████

███████████████ *Plaintiffs themselves allege in their own complaint*, namely (1) that in its original contract with ATTM, "Apple … agreed … never to disclose the unlock codes to iPhone consumers," and (2) that in subsequent years "Apple and ATTM have continued to abide by and enforce certain anticompetitive terms of their Agreement, such as the Program Locks and their refusal to give consumers the unlock codes for their iPhones."  Complaint ¶¶ 47, 54 (ER 54, 55).  There is no legitimate factual dispute between the parties over ATTM's ████████████ ████████████████████████.

Finally, Plaintiffs point out that the 2011 Agreement █████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████.

The bottom line is that Plaintiffs' entire case is directed at ATTM's exclusivity agreement with Apple, which they call "an illegal agreement that

37

violates the antitrust laws." Ward Br. 31. ███████████████████

████████████████████████████████████████████

███████████, the District Court did not abuse its discretion in holding that

ATTM is a necessary party under Rule 19(a).

### 3. Plaintiffs' Antitrust Theory Threatens ATTM's Rights In Its WSA With Consumers

If this litigation proceeds, the District Court will also inevitably have to

interpret the terms of ATTM's WSA with consumers, in ways that could affect and

impair ATTM's rights under that contract.

First, Plaintiffs themselves have argued that under this Court's decision in

*Newcal* the central issue in their antitrust case is "whether Plaintiffs knowingly

placed [Apple] in a monopoly position" when they made their initial decisions to

purchase an iPhone. Pls.' Opp. to Mot. to Dismiss at 24 (*iPhone II*, ECF No. 44)

(alteration in original) (quotation marks and citation omitted). Plaintiffs have

conceded that in arguing the merits of this issue, they will affirmatively rely upon

"the relevant terms of ATTM's WSA" to "prove the negative fact" that consumers

did not knowingly place ATTM in a monopoly position. *Id*. at 11. Plaintiffs say

that they will not need to introduce the WSA itself into the record of the case, but

assuming that dubious claim is true, they still intend to rely on the substance and

specific terms of the WSA as "disclosed and readily available *on ATTM's website*"

and as judicially admitted by Apple and ATTM in *iPhone I*. *Id*. Indeed, the

38

Complaint is chock-full of allegations about the WSA's terms, which are clearly central to their case.[9] Apple will also rely on the WSA—and especially its language indicating that "[e]quipment purchased for use on AT&T's system [*i.e.*, the iPhone] is designed for use *exclusively* on AT&T's system"—to show that consumers were aware that they would not be able to use their iPhones on other networks. WSA at 3 (emphasis added).

Moreover, Plaintiffs will presumably also argue—just as the *iPhone I* plaintiffs did when seeking class certification—that under *Newcal* the key issue is "whether Plaintiffs … entered into *binding written contracts* that obligated them to use ATTM for voice and data service for the life of the iPhones." Pls.' Reply Mem. in Supp. of Class Cert. at 7 (*iPhone I*, ECF No. 422) (emphasis added). Since the WSA is the only "binding written contract" contract between ATTM and consumers relating to voice and data service, that legal theory obviously puts the rights and obligations set forth in the WSA at the very heart of Plaintiffs' case. And even if the Court rejects Plaintiffs' incorrect reading of *Newcal*, as it should,

---

[9] *See*, *e.g.*, Complaint ¶¶ 6, 21, 22, 53, 61, 71 (ER 46, 48-49, 55, 57, 58) (addressing lack of "contractual consent"); *id*. ¶¶ 2, 46, 50, 73 (ER 45, 54, 55, 59) (duration of WSA); *id*. ¶¶ 46, 50, 71, 73 (ER 54, 55, 58, 59) (early termination fee); *id*. ¶ 56 (ER 56) (roaming charges). Despite their extensive reliance on the WSA's "relevant terms," Plaintiffs nonetheless say that the WSA "is not pertinent to [their] claims" and that the District Court "will not be required to construe or interpret it." Pls.' Opp. to Mot. to Dismiss at 11 (*iPhone II*, ECF No. 44). Plaintiffs seem to be positing a distinction between the WSA itself and the "relevant terms" of the WSA as disclosed on ATTM's website or discussed in *iPhone I*. There is no logical basis for such a distinction.

39

ATTM and Apple will still have an obvious and strong interest in showing that the WSA does not establish that consumers lacked knowledge of the exclusivity or expected to be able to use their iPhones on another service provider's network. In fact, Apple will use the WSA's terms to help demonstrate the opposite. For all parties, therefore, the proper interpretation of the WSA will be important to the disposition of the case. Rule 19(a)(1)(B)(i) protects ATTM from having the terms of its own contract interpreted, to ATTM's detriment, in ATTM's absence.

Second, if this case is allowed to proceed, the District Court will also have to construe the WSA's arbitration provisions. Apple will seek to compel arbitration both on equitable estoppel grounds—as it did successfully in *iPhone I*—because the claims against Apple are inextricably intertwined with the WSA, and because Apple is a third-party beneficiary of the WSA's arbitration clause, which encompasses "claims arising out of or relating to any aspect of the relationship between [ATTM and consumers], whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." WSA at 4; *see also id.* (requiring WSA terms to be "broadly interpreted"). Apple will point out that the antitrust claims at issue in this case obviously "aris[e] out of" and "relat[e] to" the relationship between ATTM and its consumers, because they are predicated on the assertion that ATTM conspired with Apple to trick those consumers into buying iPhones and lock them into an alleged aftermarket for voice and data services.

Plaintiffs will presumably respond by offering a contrary interpretation of the WSA (as their counsel did in *iPhone I* and *II*).

In the WSA, ATTM bargained for arbitration of any claims concerning the voice and data service it provides—and Apple is also entitled to arbitrate given Plaintiffs' theory of the case. That contractual right is valuable and important, as it entitles ATTM to avoid what Plaintiffs' counsel have already made clear will be extensive and burdensome discovery requests, to ATTM, directed at ATTM's own alleged misconduct. *See* Joint Case Management Statement at 7-8 (*iPhone II*, ECF No. 22) (requesting permission to take 30 depositions and seek extensive document discovery from ATTM). ATTM ensured that the WSA would minimize these burdens by requiring arbitration of any claims relating to ATTM's relationship with its iPhone service customers, whether brought against ATTM itself *or* against Apple. WSA at 2 (also expressly noting that arbitration "allows for more limited discovery than in court").

In short, Plaintiffs are trying to duck their contractual obligations by leaving ATTM out of the case as a formal matter. But ATTM has a clear interest in preventing Plaintiffs from "avoid[ing] contractually required arbitration" of their claims against Apple. ATTM *iPhone III* Decl. ¶ 2 (ER 43). It is accordingly a required party under Rule 19(a)(1)(B)(i).

41

## C.    Adjudicating This Case Without ATTM Threatens Other Practical Harms To ATTM

Apart from the contractual interests noted above, ATTM also has an interest in this case because it is ATTM that is accused of being the unlawful monopolist in the alleged conspiracy to monopolize. To establish that Apple is liable, Plaintiffs will try to take extensive discovery from ATTM. Plaintiffs will need to prove that ATTM is a monopolist, and that ATTM specifically intended to manipulate and deceive its own customers in an effort to exploit them and charge supracompetitive prices in an "aftermarket" for iPhone voice and data services. *See, e.g.*, *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154, 1156 (9th Cir. 2003) (requiring proof of specific intent); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986) (requiring proof of intent of "more than one of the alleged co-conspirators" (citing cases)). A decision to this effect will, "as a practical matter," impair ATTM's interests by creating damaging precedent, potentially spurring future litigation, and harming ATTM's business reputation. Fed. R. Civ. P. 19(a)(1)(B)(i).

As Plaintiffs point out, joint tortfeasors ordinarily are not required parties to a suit on the underlying tort. That is because, under standard rules of joint-and-several liability, a plaintiff can recover all of its damages from any single defendant, and joinder of additional defendants is not necessary to "accord complete relief among the parties" under Rule 19(a)(1)(A). But an absent joint

tortfeasor may be a required party under Rule 19(a)(1)(B) if an adverse outcome in the lawsuit would have significant negative collateral consequences for that adverse party.

Courts have recognized, for example, that an absent defendant may be a required party under Rule 19 if the litigation could harm its business or reputational interests, attract unfavorable attention from regulators, or establish adverse precedent for other litigation.[10]  Contrary to Plaintiffs' arguments, there is no requirement that the absent party be bound by *res judicata* or collateral estoppel in order to have interests at stake in the litigation.  *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110 (1968); *Am. Greyhound Racing*, 305 F.3d at 1024.

---

[10]  *E.g.*, *Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 24 (1st Cir. 2008) (avoiding creation of "persuasive precedent" is cognizable interest under Rule 19); *Am. Greyhound Racing*, 305 F.3d at 1024 (absent party's interests implicated because "enforcement authorities may consider themselves compelled to act against [them]"); *Laker Airways*, 182 F.3d at 848-49 (absent party's interests impaired because decision would "inevitably comment upon the neutrality and independence" of its conduct and could lead government regulator to withdraw authority); *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) ("*stare decisis* effect is an important consideration in determining the extent to which an applicant's interest may be impaired" for purposes of Rule 24(a)(2), which incorporates same impairment-of-interest standard as Rule 19(a)(1)(B)(i)); *United States v. Stringfellow*, 783 F.2d 821, 826-27 (9th Cir. 1986) (same); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 708 (S.D.N.Y. 1997) (Sotomayor, J.) (adverse precedent is cognizable interest under Rule 19(a), even without formal binding effect); *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF (RS), 2008 U.S. Dist. LEXIS 103915, at *14 (N.D. Cal. Dec. 17, 2008) (absent party required because court's judgment "might well affect [the party's] rights and business reputation").

The Eleventh Circuit's decision in *Laker Airways* shows how this rule works in practice. Laker alleged that British Airways had conspired with Airport Coordination Limited ("ACL")—a private corporation appointed by the United Kingdom to coordinate requests for landing and takeoff slots at British airports—to monopolize passenger air service between Miami and London's Gatwick Airport. Laker omitted ACL from the lawsuit, and instead sued only British Airways. The Eleventh Circuit dismissed the case after finding that ACL was a necessary and indispensable party under Rule 19. *Laker Airways*, 182 F.3d at 847-50. It explained that (1) "Laker's antitrust claims necessarily require that a court evaluate ACL's conduct in relation to Laker"; (2) ACL was clearly an "active participant" in the scheme because it was "the only entity that [could] allocate the slots at Gatwick"; and (3) "[w]ithout ACL," British Airways would not have been able to manipulate the slot allocation process. *Id*. at 848. The Court concluded that ACL had a "significant interest" in the resolution of the allegations, because the outcome of the suit would "inevitably comment upon the neutrality and independence of the process," and a finding of liability could lead the United Kingdom to "withdraw its approval of ACL as airport coordinator." *Id*. at 849.

As the District Court correctly recognized, *Laker Airways*' holding is directly applicable here. *iPhone II*, 874 F. Supp. 2d at 900. Just as in *Laker Airways*, Plaintiffs' allegations in this case "necessarily require" that the court

44

"evaluate" the conduct of an absent party—ATTM—in deciding whether Apple is liable for conspiring with ATTM in violation of the Sherman Act. 182 F.3d at 848. Plaintiffs' own Complaint emphasizes the many ways in which ATTM was central to the alleged scheme, asserting that:

- ATTM had the "specific intent to monopolize the iPhone Voice and Data Services Aftermarket," Complaint ¶ 73 (ER 58);

- ATTM and Apple agreed, "without Plaintiffs' knowledge or consent to make ATTM the exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations [otherwise]," *id.* ¶ 73 (ER 59);

- "ATTM unlawfully achieved an economically significant degree of market power in the iPhone Voice and Data Services Aftermarket as a result of the conspiracy," *id.* ¶ 74 (ER 59);

- ATTM "effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares," *id.*; and

- ATTM and Apple's conspiracy "reduced output and competition," "resulted in increased prices," and "harmed competition generally" in the alleged aftermarket, *id.* ¶ 75 (ER 59).

As these assertions make clear, ATTM is alleged to be far more than a "routine joint tortfeasor." *Laker Airways*, 182 F.3d at 847-48. Rather, it is the alleged monopolist, its contracts are key to Plaintiffs' theory of the case, and its conduct will be the central focus of any trial.

A finding in this case that ATTM conspired with Apple to monopolize the aftermarket for iPhones threatens significant—and uniformly negative—collateral consequences for ATTM. Such a finding could constitute powerful precedent in the future lawsuits or arbitrations against ATTM that a victory by Plaintiffs here

45

would make inevitable. Plaintiffs want to bring this claim as a class action, but no class has yet been certified (and, in any event, ATTM customers may choose to opt out of any class). Any consumer who chooses not to participate in this case could leverage a finding that ATTM conspired to violate the antitrust laws as ammunition in a future arbitration directly against ATTM.

A finding that ATTM conspired with Apple to violate the antitrust laws could also draw unwelcome attention from federal and state law-enforcement and regulatory agencies. Just as in *Laker Airways*, such a finding would "inevitably comment"—in a highly unfavorable way—on ATTM's business practices. 182 F.3d at 849 (concluding that finding that ACL conspired to monopolize airport slots could lead United Kingdom to cancel its role as coordinator for Gatwick Airport). Telecommunications services are highly regulated at both the federal and state level, and "enforcement authorities may consider themselves compelled to act" against ATTM if Plaintiffs prevail in a high-profile class action. *Am. Greyhound Racing*, 305 F.3d at 1024; *see also Laker Airways*, 182 F.3d at 849.

A finding that ATTM deliberately tricked its customers in an effort to boost profits would also inevitably harm ATTM's business reputation and imperil relationships with those customers. *See, e.g.*, *KnowledgePlex, Inc. v. Placebase, Inc.*, No. C 08-4267 JF (RS), 2008 U.S. Dist. LEXIS 103915, at *14 (N.D. Cal. Dec. 17, 2008). So would a finding that ATTM's alleged monopoly has allowed

them to impose "excessive international roaming charges," and an early termination fee that was "not justifiable" and provided only "illusory" benefits, as Plaintiffs have alleged. *See* Complaint ¶¶ 50, 56 (ER 55, 56). The District Court did not abuse its discretion in concluding that ATTM's interests in the outcome of this case go far beyond the typical interests held by routine joint tortfeasors.

Plaintiffs argue that *Laker Airways* is an "outlier decision" that "would swallow the general rule and undo more than 70 years of Supreme Court and Ninth Circuit precedent holding that antitrust co-conspirators need not be joined as defendants in the same action." Ward Br. 26. Not so. *Laker Airways* states a limited exception to the general rule that joint tortfeasors need not always be joined; it is not a threat to that rule. And the case is far from an outlier. *Laker Airways* has been favorably cited and relied upon by courts in the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits.[11] It is also fully consistent with the large body of case law recognizing that concerns about adverse precedent, and business or reputational concerns, can give an absent party an "interest" in litigation under Rule 19. No court of appeals has rejected the *Laker Airways* analysis, and there is no reason for this Court to create a circuit split here.

---

[11] *See* Apple's Reply ISO Mot. to Dismiss at 6 n.5 (*iPhone II*, ECF No. 57)(citing cases); *Am. Health Underwriters, Inc. v. Golden Rule Ins. Co.*, No. 5:10cv199, 2012 U.S. Dist. LEXIS 124338, at *7 (E.D. Tex. July 9, 2012).

### D. ATTM's Joinder Is Feasible

Because ATTM is a required party under Rule 19(a)(1)(B)(i) for the reasons noted above, it "must be joined" in this lawsuit so long as joinder is "feasible." Fed. R. Civ. P. 19(a).  There are only three circumstances in which joinder is *not* feasible: (1) when the absent party is "not subject to personal jurisdiction"; (2) when joinder "would destroy subject matter jurisdiction"; and (3) when "a joined party objects to venue and the joinder would make venue improper."  *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005); Fed. R. Civ. P. 19(a)(3). None of these circumstances is present here.

Plaintiffs' only argument for why joinder is infeasible is that ATTM will likely seek to compel arbitration, which would result in ATTM "be[ing] dismissed for improper venue."  Ward. Br. 33.  That is incorrect.  There is no basis for such a challenge under the venue statute, 28 U.S.C. § 1391, which does not mention arbitration.  ATTM's motion to compel arbitration of identical claims in *iPhone I* did not address venue at all, and there is no reason to think any such motion in this case would be any different.  *See* Mem. ISO AT&T Mot. to Compel Arbitration (*iPhone I*, ECF No. 116).

Moreover, if ATTM succeeds in compelling arbitration, the District Court would most likely retain jurisdiction and stay the case pending the outcome of the arbitration proceedings, as it did in *iPhone I*.  *See* 826 F. Supp. 2d at 1179 ("The

case is stayed while Plaintiffs pursue their claims in arbitration."). And even if the District Court opts to dismiss the case against ATTM, it would do so for failure to state a claim under Rule 12(b)(6), and not for improper venue under Rule 12(b)(3). *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004) (affirming dismissal of claims subject to arbitration under Rule 12(b)(6)).

The District Court correctly held that ATTM's joinder *is* feasible, and that Plaintiffs' refusal to join ATTM requires dismissal of their case under Rule 12(b)(7). This Court should affirm that decision.

### E.  Even If ATTM's Joinder Were Not Feasible, Dismissal Would Still Be Required Because ATTM Is Indispensable Under Rule 19(b)

If this Court disagrees with the District Court's analysis and concludes that ATTM *cannot* be joined, it should conclude that ATTM is indispensable and affirm the dismissal of this case under Rule 19(b).

Under Rule 19(b), the court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" because the absent party cannot be joined. Fed. R. Civ. P. 19(b). Among the factors the court must consider are (1) "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties"; (2) "the extent to which any prejudice could be lessened or avoided" by

the court; and (3) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(1), (2), (4).

All of these factors support dismissal here. ATTM's interests would be prejudiced in all of the ways that its interests are threatened for purposes of the Rule 19(a) analysis. *See Wilbur*, 423 F.3d at 1114 (noting that Rule 19(b)(1) prejudice factor, "insofar as it focuses on the absent party, largely duplicates the consideration that made a party necessary under Rule 19(a)"); *supra* Parts I-B, I-C. This Court's key precedents applying Rule 19 in circumstances when the absent party's contractual rights are at risk uniformly hold that such a party is indispensable under Rule 19(b). *See, e.g.*, *Wilbur*, 423 F.3d at 1113-15; *Am. Greyhound Racing*, 305 F.3d at 1024-25; *Dawavendewa*, 276 F.3d at 1157; *Lomayaktewa*, 520 F.2d at 1325-27. ATTM would also suffer harm because a judgment against Apple would necessarily require a finding that ATTM conspired to monopolize the aftermarket for iPhone voice and data services, thereby exposing ATTM to further litigation and regulatory scrutiny and harming its business reputation. *See, e.g.*, *Paiute-Shoshane Indians of the Bishop Cmty. v. City of Los Angeles*, 637 F.3d 993, 1001 (9th Cir. 2011); *Laker Airways*, 182 F.3d at 848-50; *Fernandez*, 516 F.3d at 24.

Apple would also suffer prejudice if forced to litigate this case without ATTM. To defend against Plaintiffs' conspiracy-to-monopolize claim, Apple will

50

need to show that ATTM lacked the required specific intent to manipulate its customers and monopolize the alleged aftermarket. But as this Court held in *Paiute-Shoshane Indians*, a named party "cannot reasonably be expected to defend the actions of an entirely different entity [*i.e.*, the absent party] over which [the named party] had no control." 637 F.3d at 1001. "Proceeding with this suit in the absence of [ATTM] therefore would prejudice [Apple] because [Apple] by itself cannot defend effectively against the crux of Plaintiff's allegations, even though these allegations may be untrue." *Id*. In these circumstances, the absent party is indispensable under Rule 19(b) and the case must be dismissed. *Id*. at 1001-02.

None of the prejudice—to either ATTM or Apple—can be "lessened or avoided" by the district court in the manner envisioned by Rule 19(b)(2). That prejudice is inevitable given the nature of Plaintiffs' antitrust claim, which *requires* a direct analysis of ATTM's liability and—if successful—would result in declaratory and injunctive relief that impairs directly impairs the parties' contractual rights and other interests. *Wilbur*, 423 F.3d at 1114 (rejecting notion that court could "lessen or avoid any prejudice by the shaping of relief or protective provisions in the judgment" in similar circumstances); *Am. Greyhound Racing*, 305 F.3d at 1025 (same holding); *Laker Airways*, 182 F.3d at 849 (same).

Finally, there is no question that Plaintiffs "*would* have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4) (emphasis

51

added).  Both Apple and ATTM have expressly recognized that Plaintiffs' antitrust claims can proceed in arbitration under the WSA, and the Supreme Court and this Court have both held that arbitration is an appropriate and adequate forum for resolving those claims.  *Concepcion*, 131 S. Ct. at 1752-53; *Coneff v. AT&T Corp.*, 673 F.3d 1155, 1157-62 (9th Cir. 2012).

## II.   DISMISSAL IS ALSO PROPER BECAUSE PLAINTIFFS CANNOT PLAUSIBLY ALLEGE THAT ATTM HAS MONOPOLY POWER WITHIN A RELEVANT MARKET

The District Court's decision also should be affirmed for the independent alternative reason that Plaintiffs have failed to allege evidentiary facts establishing a plausible entitlement to relief.  *See Twombly*, 550 U.S. at 569-70.  The issue is whether Plaintiffs adequately pled that ATTM had monopoly power in a relevant market (as that is a necessary predicate for the claimed conspiracy to monopolize involving both ATTM and Apple).  Plaintiffs' contention is that while ATTM was the only authorized provider of voice and data services for iPhones, it monopolized an "aftermarket" for providing voice and data services for iPhones.  Complaint ¶¶ 69-71 (ER 58).

As this Court explained in *Newcal,* the legal concept of an aftermarket is viable only under certain conditions, one of which is that "consumers could not, at the time of purchase, reasonably discover" the challenged aftermarket practice. 513 F.3d at 1048.  Plaintiffs have not pled a plausible entitlement to relief because

the facts alleged in the Complaint, supplemented with public record materials appropriate for judicial notice, make clear that iPhone purchasers knew—or at a minimum reasonably could have known—that ATTM would be the exclusive provider of iPhone voice and data services for an extended period, even beyond the two-year term of the WSA. Plaintiffs only quarrel with *how much* consumers were told about that exclusivity, which is insufficient under *Newcal*.

The District Court did not need to reach Apple's 12(b)(6) arguments, but this Court can "affirm the district court's judgment on any ground supported by the record, even if the district court did not rely on the ground." *Orsay v. Dep't of Justice*, 289 F.3d 1125, 1132 (9th Cir. 2002). And these issues have already been thoroughly developed in this and related litigation. *See* Pls.' Opp. to Mot. to Dismiss at 23 (*iPhone II*, ECF No. 44) (the market definition issue has been "fully and fairly litigated").

To state a claim under Section 2 of the Sherman Act, Plaintiffs must plead that ATTM possesses "monopoly power in the relevant market." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407 (2004). An "aftermarket" is "a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An*

53

*Analysis of Antitrust Principles and Their Application* ¶ 564b (last updated Apr.

2013). This is Plaintiffs' market definition, graphically:



Plaintiffs use the aftermarket doctrine to disassociate ATTM and Apple from their

competitors. The fact that ATTM was, for a time, the only network carrier who

could service iPhones is used to brand ATTM as a monopolist.

The *iPhone I* plaintiffs, represented by the same counsel as Plaintiffs here,

claimed that the *initial*, mandatory ATTM service contract acquired with the

iPhone is a purchase in the so-called aftermarket. The *iPhone III* Complaint is

notably vague about this, and at times Plaintiffs say that the hypothesized

"aftermarket" begins only after the initial two-year WSA with ATTM ends. But

since in *iPhone I*, the plaintiffs ultimately claimed antitrust injury and damages

based on payments made during the initial two-year contract, and unequivocally

took the position that such payments were in the aftermarket, that possibility must be considered here.[12]

Plaintiffs' aftermarket theory violates the fundamental principle of antitrust market definition, which is that the "relevant" market includes *all* of the products or services that compete with each other. *See Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434-35 (9th Cir. 1995). It "must encompass the product at issue as well as all economic substitutes for the product." *Newcal*, 513 F.3d at 1045. Clearly, any consumer who bought an iPhone during ATTM's exclusivity period had other choices, including (a) another phone plus ATTM service, and (b) another phone plus another carrier's service. So there has to be a good and legally sufficient reason to ignore those competitive choices before the particular combination of the iPhone and ATTM service is a relevant antitrust market.

Plaintiffs have failed to plead facts supporting the existence of a legally viable aftermarket. First, an aftermarket theory cannot possibly lie when the alleged aftermarket product is part of a package purchased at the same time in the primary market. *See, e.g., Apple, Inc. v. Psystar Corp.,* 586 F. Supp. 2d 1190,

---

[12] Pls.' Reply Mem. in Supp. of Class Cert. at 10-11, 17-20 (*iPhone I*, ECF No. 422); Pls.' Expert Reply Decl, of Simon J. Wilkie at 3-11 (*iPhone I*, filed under seal Apr. 20, 2010). Plaintiffs appear to have disclaimed this allegation in their response to Apple's motion to dismiss in *iPhone II* (incorporated by reference here), where they expressly endorsed the district court's analysis in *iPhone I*, which described the alleged aftermarket in this case as coming into play only "after the initial two-year service period expired." *iPhone I*, 596 F. Supp. 2d at 1294; Pls.' Opp. to Mot. to Dismiss at 23-25 (*iPhone II*, ECF No. 44).

1201 & n.4 (N.D. Cal. 2008) (rejecting aftermarket claim because "customers purchase the alleged primary- and aftermarket-products at the same time, as a package").  As the term implies, an *after*market requires the aftermarket good (or service) to be purchased *subsequent to* the purchase of the primary good that creates "lock-in."  *See* Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*, 63 Antitrust L.J. 483, 486 (1995) (in an aftermarket, system "components are purchased at different points in time").  Otherwise the law presumes that consumers will be protected by the competitive forces in the primary market.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) ("Unlike the plaintiffs in *Kodak*, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement.")  Indeed, *Newcal* addressed this directly, and in permitting the aftermarket claims in that case to proceed stressed that the allegedly anticompetitive "flex agreements are not part of the initial market," and that the alleged monopolist "obtains the flex agreements only *after* obtaining an initial lease or contract."  *Newcal,* 513 F.3d at 1050.  Thus, if as in *iPhone I* Plaintiffs intend their claim to encompass what consumers paid ATTM during the initial service contract, that does not even qualify as an aftermarket theory.

If Plaintiffs' claim is limited to follow-on voice and data service purchased *after* the initial WSA expired, the Complaint still does not allege evidentiary facts

establishing a plausible entitlement to relief. Plaintiffs' aftermarket theory fundamentally misapprehends the basis for the aftermarket doctrine, substituting the consumer protection notion of *non-disclosure* for the relevant question of whether the aftermarket is competitively disciplined by the primary market.

Since the seminal *Kodak* decision, the aftermarket case law has recognized that competition in the primary market—such as the choice consumers had to buy a Blackberry with Verizon service instead of an iPhone with ATTM service— ordinarily constrains market or monopoly power *overall*. *See Kodak,* 504 U.S. at 477 n.24; *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp*., 188 F.3d 11, 17 (1st Cir. 1999). *Newcal* refers to an "economic presumption" that in ordinary situations "consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter [a] contract" that restricts later choices. *Newcal,* 513 F.3d at 1050. An aftermarket claim therefore requires allegations of evidentiary fact giving rise to a reasonable inference that the aftermarket has become economically *disconnected* from the primary market, such that competition in the primary market no longer disciplines prices that the seller can charge in the aftermarket. "Unless the evidence shows that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket, the aftermarket is not the relevant market." *SMS*, 188 F.3d at 17.

In *Kodak*, the Supreme Court noted that two economic conditions, "the existence of significant information and switching costs," could cause an aftermarket to become disassociated from a primary market. 504 U.S. at 473. This has led to numerous cases discussing how much consumers must know to ensure that the primary market adequately disciplines an aftermarket, and establishing that even "'very imperfect knowledge'" suffices. *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 956 (D. Ariz. 2001) (quoting Areeda, *Antitrust Law* ¶ 1740 (1996)). The gist of these cases is that true aftermarkets—where the aftermarket products are purchased long after the primary products—are still not relevant antitrust markets if enough consumers could reasonably anticipate how their vendors would treat them over time when they bought the primary product. As this Court explained in *Newcal,* aftermarket monopolization claims are viable only if "consumers could not, at the time of purchase, reasonably discover" the challenged aftermarket practice. 513 F.3d at 1048; *see also* Areeda, *Antitrust Law* ¶ 564b ("[I]gnorance should be measured by an objective test requiring proof that aftermarket prices were simply not available in the relevant literature; otherwise, we reward customers for not making reasonable inquiries about aftermarket costs.").

Even if "iPhone voice and data services" qualified as an aftermarket, Plaintiffs' Complaint fails to allege facts supporting a plausible entitlement to

relief under these standards. Consumers plainly knew, and at a minimum reasonably could have known, that ATTM would be the exclusive provider of voice and data service for the iPhone for a multi-year period.

It is undisputed that Apple's exclusivity arrangement with ATTM was widely publicized and disclosed, well before the sale of any iPhones. The Complaint itself declares that in January 2007—six months before the iPhone launched—"Apple announced that it had entered into an exclusive agreement making ATTM the only authorized provider of wireless voice and data services for iPhones in the United States." Complaint ¶ 44 (ER 53). Apple reinforced this statement on the iPhone box label *and* on the Frequently Asked Questions section of its website, which included the following: "Can I 'unlock' my iPhone for use with another wireless provider? No, AT&T is the exclusive wireless provider for the iPhone in the United States." Declaration of Lola A. Kingo, Exh. K (*iPhone I*, ECF No. 356-3).

Allegations about whether consumers were told *enough* about ATTM's exclusive rights, in particular how long they might have them, should not suffice to plead an aftermarket. In the first place, non-disclosure of this sort, the usual province of consumer protection law, is rarely if ever an antitrust issue.[13] The

---

[13] *See* Areeda, *Antitrust Law* ¶ 519; *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136 (1998) (higher prices as result of affirmative deception are not an antitrust issue).

issue here is *power*:  Was ATTM competitively constrained because consumers had a choice to buy something other than the particular combination of an iPhone with ATTM service, or was it a monopolist?  Consumers obviously had choices, ATTM clearly had competition, and no non-disclosure theory can change that.

That said, it is undisputed that Apple specifically told consumers—on the label on the original iPhone box, no less—that  they would be required to obtain iPhone voice and data service from ATTM for the initial two-year contract period, *and* that a "[s]ervice plan with AT&T [is] required for cellular network capabilities on expiration of initial two-year agreement." *See* Request for Judicial Notice, Exh. B (*iPhone I*, ECF No. 123-2) (emphasis added).  The label further noted that wireless service "is *solely* provided by" ATTM.  *Id.* (emphasis added).  In addition, the WSA declared that the iPhone was "designed for use *exclusively* on AT&T's system."  WSA at 3 (emphasis added).

Apple's exclusive arrangement with ATTM was also extensively reported in numerous national news outlets.  For example, the *Wall Street Journal* noted in October 2007 that ATTM had obtained "exclusive rights to be the iPhone's U.S. network for an undisclosed period of years" and that Apple had "locked and relocked the phone to make sure consumers can't override that [exclusivity] restriction."  Walter S. Mossberg, *Free My Phone*, Wall St. J., Oct. 22, 2007 (cited at Complaint ¶ 31 (ER 50)) (RJN, Exh. M).   Ironically, Plaintiffs got (and then

60

pleaded) the notion that the exclusivity period was five years from *USA Today,* which reported that ATTM's exclusivity rights would last "for five years—an eternity in the go-go cellphone world," and went on to issue a "[b]ottom line" warning to consumers: "If you want an iPhone anytime soon, you'll have to take your business to AT&T." Leslie Cauley, *AT&T Eager to Wield Its iWeapon*, USA Today, May 21, 2007 (RJN, Exh. A).[14]

Accordingly, this is not the case for anyone to be claiming that the courts should break new ground and allow non-disclosure or even deception to support a finding of market power. Plaintiffs' allegations are squarely contradicted by facts set forth in the complaint or subject to judicial notice. This Court has not hesitated to order claims dismissed in similar circumstances. *See, e.g.*, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001).

In seeking class certification in *iPhone I*, plaintiffs advanced a much more aggressive argument, which is that the voluminous evidence of disclosure is irrelevant because, under *Newcal,* the only way for ATTM (and Apple) to avoid the conclusion that "iPhone voice and data services" is a relevant antitrust market was to have gotten all iPhone consumers to agree—in a binding, written contract— that they would obtain service from ATTM for the full duration of any exclusive

---

[14] *See also, e.g.*, Peter Svensson, *How the iPhone Breaks Industry Rules*, Assoc. Press (June 28, 2007) ("Apple has given [ATTM] a five-year U.S. exclusive on the iPhone, another unheard-of deal for the industry.") (RJN, Exh. E); RJN Exhs. B-D, F-L, N (attaching 12 additional press reports).

arrangement with Apple.[15]   In other words, plaintiffs argued that aftermarket practices that consumers do not explicitly "agree" to when committing to the primary product are, just for that reason, susceptible to monopolization claims under the *Kodak* aftermarket doctrine.  In *iPhone I,* the district court accepted this argument.  *iPhone I,* 596 F. Supp. 2d at 1305-06.

This is nearly the opposite of what *Newcal* holds.  *Newcal* explained that aftermarket monopolization claims are barred by consumer knowledge in circumstances significantly broader than the very easiest cases, like *Queen City Pizza*, where consumers actually signed a contract explicitly agreeing to the exclusivity they later characterize as monopolization.  *See Newcal*, 513 F.3d at 1048-49.  The Court held that so long as consumers can, "at the time of purchase, reasonably discover" that the aftermarket restriction exists, that is as a matter of law the "functional equivalent of a contractual commitment" and defeats a claim of aftermarket monopoly power.  *Id.*  Indeed, *Newcal* speaks of the consumer who buys a product knowing what awaits in the aftermarket as one who confers on its

---

[15]   *See* Pls.' Reply Mem. in Supp. of Class Cert. at 7 (*iPhone I*, ECF No. 422) (arguing that "the definition of the aftermarket in this case depends upon whether Plaintiffs … entered into binding written contracts that obligated them to use ATTM for voice and data service for the life of the iPhones," and noting that WSA contains no such provision); *id.* at 7-8 ("No matter what newspaper or magazine articles or Internet web sites consumers may have seen, and regardless what cryptic statement appeared on the bottom of the iPhone box, the undisputed common fact is that every ATTM service contract lasted only two years and could be terminated at any time."); *id*. at 10 (arguing that knowledge must be determined solely by WSA).

vendor an "agreed-upon right to monopolize [the] aftermarket." *Id.* The point, which the district court in *iPhone I* missed, is that the law will not allow consumers who purchase a product (like the iPhone) with fair notice of what awaits them (no other carrier choices) to claim later that they were victims of an aftermarket monopoly. *All nine Justices in the* Kodak *case agreed with this. See Kodak*, 504 U.S. at 477 n.24 (majority opinion), 492 (Scalia, J., dissenting); *see also Newcal,* 513 F.3d at 1048-49.

Plaintiffs asserted below that Apple's disclosure arguments merely raise a "factual dispute" that is better suited for resolution at a later stage in the case. Pls' Opp. to Mot. to Dismiss at 24 (*iPhone II*, ECF No. 44). But massive antitrust cases like this one are extraordinarily burdensome and expensive—for the parties and the court. A plaintiff must plead evidentiary facts establishing a plausible case at the outset, or face dismissal. And there is *no* plausible argument that reasonable consumers were unable to discover that ATTM would be the exclusive provider of iPhone voice and data services. Plaintiffs' unique spin on *Newcal* presents a legal issue, not a factual issue of any kind, and should be reviewed now. If the Court applies the *Newcal* reasoning that consumer knowledge can be the "functional equivalent" of a contractual agreement to exclusivity, this case is easy and admits of only one outcome: dismissal.

## CONCLUSION

For the foregoing reasons, Apple respectfully asks this Court to affirm the decision below.

Dated: June 21, 2013                 Respectfully submitted,

                                       s/ Daniel M. Wall

Daniel M. Wall
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600

*Counsel for Defendant-Appellee Apple Inc.*

## STATEMENT OF RELATED CASES

Apple is not aware of any related cases pending in this Court.


## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C), Ninth Circuit Rule 32-1, and this Court's order of May 8, 2013, the foregoing brief is proportionately spaced, has a typeface of 14 point and contains 15,395 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

s/ Daniel M. Wall
Daniel M. Wall

## CERTIFICATE OF SERVICE

I, Daniel M. Wall, hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 21, 2013, which will serve all counsel registered to receive electronic notices.

s/ Daniel M. Wall
Daniel M. Wall